_____

No. 96-1086WM
_____

Eric Clemmons,               *
                             *
          Appellant,         *
                             *   On Appeal from the United
     v.                      *   States District Court for
                             *   the Western District of
                             *   Missouri.
Paul Delo, *
                             *
          Appellee.          *

_____

Submitted:  June 13, 1996

Filed:  November 22, 1996
_____

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Circuit Judge, and
     KORNMANN,* District Judge.
_____

RICHARD S. ARNOLD, Chief Judge.


     Eric Clemmons, the petitioner, has been sentenced to death for
killing a fellow inmate at the Missouri State Penitentiary.  Exculpatory
evidence was apparently withheld from Clemmons by the State prior to his
trial.  In addition, evidence that was important to the State's case came
in by deposition, raising serious issues under the Confrontation Clause.
The District Court[1] held, however, that both these claims were procedurally
barred.  After thorough

_____

     *The Hon. Charles B. Kornmann, United States District Judge
for the District of South Dakota, sitting by designation.

     [1]The Hon. Howard F. Sachs, United States District Judge for
the Western District of Missouri.

consideration, we affirm, though not altogether for the same reasons.[2]

## I.

The District Court and the Missouri Supreme Court have rendered careful and detailed opinions reciting the facts in this case. Clemmons v. Delo, No. 90-0943-CV-W-6, slip op. (W.D. Mo. July 7, 1995); State v. Clemmons, 753 S.W.2d 901 (Mo.) (en banc), cert. denied, 488 U.S. 948 (1988). We will summarize them here only to the extent necessary for our review.

On August 7, 1985, Clemmons was an inmate at the Missouri State Penitentiary. Shortly before 9:00 that evening, Corrections Officer Thomas Steigerwald, while walking towards a group of inmates standing near Housing Unit 3, observed one of the inmates grab another, strike him in the chest, and then hit him with a roundhouse punch in the side. Henry Johnson, the inmate who had been struck, ran past Steigerwald to the entrance to the main corridor. As he did so, Steigerwald noticed blood on Johnson's shirt. It was then that Steigerwald realized that a stabbing had occurred.

Steigerwald called for backup on his radio and began to pursue the inmate whom he had seen striking Johnson. That inmate, who was

---

[2]Petitioner also argues that certain claims made in his habeas petition were admitted by the State when (according to him) it failed to deny them in a timely fashion, and that his trial counsel was ineffective in failing to object to certain allegedly improper actions of the prosecutor, in failing to ask on voir dire whether potential jurors would automatically vote for the death penalty, in failing to conduct voir dire on the presumption of innocence, in failing to present certain mitigating evidence, including character witnesses, accomplishments of the defendant, and psychological testimony, and in failing to make an offer of proof of the testimony of one Robert E. Lee. We have considered these arguments and reject them, substantially for the reasons given in the District Court's opinion.

wearing a gray sweatshirt, and another inmate, who was wearing a gray towel around his head, began to move towards the prison chapel. Eventually, these inmates separated, and Steigerwald decided to pursue the one in the gray sweatshirt. He testified that he saw the faces of both inmates, as well as a knife in the hand of the inmate in the gray sweatshirt.

Steigerwald eventually caught up with the inmate in the sweatshirt, who was Clemmons. By that time the sweatshirt had been turned inside out so that it appeared to be white. There was human blood on the gray part of the sweatshirt, though it could not be typed. No knife was ever found.

The inmate in the gray towel was also caught. When his cell was searched, a hat and a school book belonging to Clemmons were found. The book was splattered with blood. The inmate had been seen entering the housing unit carrying the hat and the book shortly after the stabbing. The blood splatters on the hat were human blood of either type B or type AB. Johnson, the victim, had type B blood.

Johnson later died. An autopsy revealed that he had been stabbed three times. The fatal blow was to the left side of his chest and penetrated his heart. He also sustained a stab wound to his left side and another under his right arm. A scratch on his shoulder was also discovered, but it is uncertain whether the scratch was inflicted at the same time as the three stab wounds. Prior to his death, Johnson exclaimed, "they have stuck me in my heart."

Clemmons was charged with murdering Johnson. At his trial, there were two pieces of particularly damaging evidence against him. The first was Steigerwald's testimony identifying him as the person who struck Johnson and as having a knife. The second was testimony from Captain A. M. Gross that Clemmons had stated in

Gross's presence, "I guess they got me." Clemmons's defense was that another inmate, Fred Bagby, had killed Johnson, and several inmates testified more or less to that effect. According to Clemmons, what Steigerwald saw was Johnson running into Clemmons after Bagby had already stabbed Johnson. Bagby had died by the time of trial, and the State argued that the testimony of Clemmons's witnesses should be discounted because it was easy for them to try to help Clemmons by blaming someone (Bagby) who could not defend himself.

Clemmons was found guilty. In the penalty phase, several aggravating circumstances were alleged. Most notably, Clemmons was a prisoner under sentence of life imprisonment without possibility of parole for 50 years for another murder when Johnson was killed. The jury sentenced Clemmons to death.

## II.

Clemmons alleges that exculpatory evidence was withheld from him prior to his trial in violation of Brady v. Maryland, 373 U.S. 83 (1963). Following Clemmons's direct appeal, he discovered an important piece of evidence. On the very day that Johnson was killed, a Department of Corrections inter-office communication was written by Captain A. M. Gross, the same Captain Gross who testified against Clemmons, stating that another inmate had accused Fred Bagby of killing Johnson. The inter-office communication reads as follows:

> On the above date at approximately 9:30 P.M. I was searching the upper yard for evidence in the stabbing that had taken place about 8:55 P.M. on inmate Johnson, Henry . . . when I met and interviewed inmate Clark, Dwight . . . . Clark said that he had witnessed the assault on Johnson, and that he had seen two (2) men stabbing Johnson. He described both assailants as being black, and he thought one was inmate Fred Bagby but only

> knew the second inmate by sight. When questioned
> in detail Clark did not make sense and further
> investigation reflects that Clark's statement is
> untrue.

This evidence was not provided to Clemmons's attorney, despite a discovery request for "[a]ny material or information . . . which tends to negate the guilt of the defendant."[3]

Clemmons raised the failure to disclose this memo in his initial postconviction motion under Rule 29.15 of the Missouri Rules of Criminal Procedure. The memo itself was introduced in evidence at the 29.15 hearing without objection from the State. Clemmons did not, however, call Clark as a witness, even though he had subpoenaed Clark, and Clark was available to testify. In fact, Clemmons himself specifically chose not to call Clark as a witness.

The 29.15 court denied Clemmons's motion, but did not discuss the Brady issue. Clemmons then appealed to the Missouri Supreme Court. See Clemmons v. State, 785 S.W.2d 524 (Mo.) (en banc), cert. denied, 498 U.S. 882 (1990) (affirming denial of postconviction relief). There, however, his lawyer, contrary to repeated instructions from Clemmons, failed to raise the issue of the undisclosed evidence. Clemmons, in an effort to save the issue, attempted to file a pro se supplemental brief with the Missouri Supreme Court, but his motion for leave to file the brief was denied.

Clemmons once again raised the Brady issue in his petition for

-------

[3]The State contends that the memorandum was in Johnson's inmate file, which was reviewed by trial counsel for Clemmons. We agree with the District Court that "[t]here is little need to resolve the [issue]." Slip op. 13. "[I]f the memorandum was in the victim's file, but was not examined or was discounted by [trial counsel]," ibid., a claim of ineffective assistance of counsel would arise that would be just as strong or just as weak, as the case may be, as the Brady claim Clemmons now presses.

a writ of <u>habeas corpus</u> before the District Court.  That Court held that the claim was procedurally barred.

## A.

As we have seen, the <u>Brady</u> claim was raised in the trial court on Clemmons's petition for postconviction relief under Rule 29.15.  The Gross memorandum was introduced into evidence by petitioner, without objection from the State.  Moreover, there was not then, nor is there now, any claim by the State that the memorandum was  a fabrication or was for any reason not authentic.  It is true that petitioner did not call Clark as a witness at the postconviction hearing, though Clark had been transported from the prison in order to testify and was readily available for that purpose.  We cannot agree, however, that the failure to call Clark operated as a waiver of the <u>Brady</u> claim itself, though, if the merits of the claim are to be reached, our consideration will have to be limited to the memorandum, and cannot include the testimony given by Clark at the federal habeas hearing.  See <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1, 8-10 (1992) (holding that factual development of a claim must take place in the state courts).[4]

Petitioner's difficulty stems from the fact that the <u>Brady</u> issue was not raised in the appeal from the denial of postconviction relief. Omission of this issue was a serious mistake by Clemmons's appointed counsel, perhaps the sort of mistake that, if committed at trial or on direct appeal, would

---

[4]We do not know why petitioner decided not to call Clark.  We do know that this decision was made by petitioner himself, not by post-conviction counsel.  There may be a reasonable inference here that petitioner had spoken with Clark privately and had determined that Clark's testimony would not help him.  Clark testified later, at the evidentiary hearing in the federal habeas court, and his testimony was quite favorable to petitioner, but this does not necessarily mean that Clark would have testified to the same effect at the time of the State post-conviction hearing.

amount to ineffective assistance in violation of the Sixth and Fourteenth Amendments, but error of this kind on the part of postconviction counsel cannot be "cause" to excuse a procedural default. See Coleman v. Thompson, 501 U.S. 722, 753 (1991); Nolan v. Armontrout, 973 F.2d 615 (8th Cir. 1992).

What we have here, however, goes beyond a mere omission on the part of counsel. After counsel had been appointed to represent Clemmons on his 29.15 appeal (counsel different from the lawyer who had represented him in the postconviction trial court) Clemmons wrote the new lawyer to request that he be kept informed. He specifically stated that he wanted all of his issues preserved. Appointed counsel, however, filed a brief in the 29.15 appeal without giving Clemmons an opportunity to review it and without including in the brief all of the issues previously raised in the trial court. Petitioner then wrote counsel and instructed him to file a supplemental brief raising the additional issues. Clemmons specifically drew the attention of counsel to the danger that issues not raised would later be held not to have been properly presented. "I want you to lay the ground work so if the Missouri Supreme Court refuse [sic] to hear [the unbriefed issues] the record will clearly show we tried to present them." Letter of December 26, 1989, App. 270. Counsel refused, stating that he had "made every argument on your behalf that I felt could be supported by law and evidence." Letter of December 29, 1989, App. 271.

Clemmons then made a motion in the Missouri Supreme Court for leave to file a supplemental brief pro se. This motion recites that appointed counsel had filed a brief raising only six points, that Clemmons had requested in writing that every other ground preserved by the record also be raised, and that counsel had refused this request. The motion further states that no fewer than 130 additional points should have been raised. It asks the Court to accept a number of documents "as a supplemental brief in this cause," including the original and first amended 29.15 motions,

-7-

both of which documents, presumably, were in the record before the Missouri Supreme Court. The Court denied the pro se motion without comment. The documents referred to in the motion included the <u>Brady</u> issue now under discussion.

As noted above, we agree with the State that mistakes made by counsel in postconviction proceedings do not constitute "cause" for habeas purposes. The initial question, though, is not whether there was cause to excuse a procedural default, but whether there was a default in the first place. In other words, did Clemmons fairly present his <u>Brady</u> claim in the state courts? In the perhaps unique circumstances of this case, we think the answer is yes.

It is perfectly true that counsel does not have to present every issue appearing in the record. In fact it could be bad lawyering to do so, especially when there are so many potential issues. As counsel remarked in his letter to Clemmons, "[y]ou can't expect every single allegation to hold up in court, and it's not the number of allegations that matters anyway. One good issue is better than a thousand others." App. 271. The client, however, is and always remains the master of his cause. Here, Clemmons did the only thing he could do: he tried to bring the issue to the attention of the Missouri Supreme Court himself. We do not criticize that Court for refusing leave to file the supplemental brief. Such matters are within the Court's discretion. Our own practice is usually to refuse leave to file supplemental briefs in cases in which counsel has appeared.[5]

---

[5]In the present case, we have before us three pro se filings. First, a pro se supplemental brief was received on May 13, 1996. The motion for leave to file this brief is granted. Second, we received on June 10, 1996, an additional document styled "Oral Argument Written Statement." We have considered this document. Third, on September 3, 1996, Clemmons filed a pro se motion to supplement the record. This motion is granted, and we have considered the materials attached to it. This Court's normal practice is to refuse pro se filings from clients who are represented by counsel. We have departed from our normal practice in this case for two reasons: Clemmons's history of difficulty with previously appointed counsel, and the fact that this is a death-penalty case.

-8-

The fact remains that

Clemmons called the attention of the Supreme Court of Missouri to his <u>Brady</u> claim, among many others. We do not know what else he could have done, as a practical matter, to present the claim to that Court for decision on the merits.[6] We therefore hold that the claim was fairly presented, and that the merits are now open for decision on federal habeas corpus.

B.

The question to be answered is this: If the Gross memorandum, but not Clark's live testimony, had been before the state trial court, how would the case have been different? In order to succeed, Clemmons must show a reasonable probability that the outcome would have been different. "A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.) (adopted by the Court in <u>Kyles v. Whitley</u>, 115 S. Ct. 1555, 1566 (1995)).

Petitioner does not have to show that he would more likely

---

[6]At the evidentiary hearing on this habeas petition, the District Court suggested that Clemmons could have fired his lawyer and then filed his pro se brief. No doubt a client can always discharge his lawyer, but the suggestion does not seem practical in the present circumstances. When Clemmons learned, after the fact, that his lawyer had violated his instructions by filing a brief omitting issues the client wanted raised, oral argument was only about a month away. Clemmons could have asked for appointment of new counsel to make the argument and file a supplemental brief, but he had no way of knowing whether such a motion would be granted. (Nor do we.) If he thought about this alternative, he could reasonably have concluded that it would not be in his best interest to risk having no lawyer at all to argue his case. We do not normally order the release of inmates from jail to argue their appeals pro se, and we assume the practice of the Supreme Court of Missouri is similar.

-10-

than not have been acquitted if the withheld evidence had been before the jury. "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . .." Kyles v. Whitley, supra, 115 S. Ct. at 1566. The question is rather whether the defendant, in the absence of the evidence in question, "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Ibid. Further, petitioner does not have to show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Ibid.

We have read the entire transcript of the guilt phase of the trial as it actually occurred in 1987. What would the evidence have looked like if the defense had been given, and had used, the later-discovered Gross memorandum dated August 7, 1985? The main support for the State's case, the eyewitness testimony of Officer Steigerwald, would be unchanged. Steigerwald's testimony was clear, consistent with the physical evidence about the location of blood, and unshaken on cross-examination. It was almost dark when the incident began, and Steigerwald was a considerable distance away, but he was within 10 or 12 feet of Clemmons (the inmate in the gray sweatshirt whom he had seen strike Johnson) when he saw the knife in his hand. There is absolutely no reason to suspect that Officer Steigerwald fabricated any part of his testimony, and no one suggests that he did so. It is always possible, of course, that he was mistaken, but, to the extent that the written page conveys an impression, we find his testimony convincing.

The other major witness for the State was Captain A. M. Gross, who testified about the admission Clemmons is supposed to have made the next morning. Clemmons now denies that he made any such statement, but not much in the way of a concrete reason for disbelieving Captain Gross is suggested. Presumably the Clark memorandum would have been used by the defense during the cross

-11-

examination of this witness. Also presumably, the witness would have admitted, after seeing the memorandum, that Clark had identified Bagby as the culprit immediately after the incident, at a time when Bagby was still alive. The memorandum, however, does not cut all one way. It ends with the following sentence: "When questioned in detail Clark did not make sense and further investigation reflects that Clark's statement is untrue." If the matter had been pursued on cross-examination, Gross would probably have given his reasons for making this statement. In the alternative, the State could have brought out his reasons on re-direct. In either event, we think it likely that the impact of the first portion of the memorandum would have been somewhat diminished.

The fact that Clark had accused Bagby before Bagby's death would, to be sure, have been useful to the defense in connection with the State's attack on the credibility of defense witnesses. Three inmates, Justice Mays, Seymour G. Abdullah, and Keith Brown, testified for the defense. On direct examination, Mays testified unequivocally that the victim, Johnson, hit Bagby in the face, and that Bagby then pulled a knife and stabbed Johnson three times. Johnson then ran and bumped into Clemmons, the defendant. On cross-examination, however, Mays's testimony was seriously undermined. When he realized that he had placed the location of the alleged collision between Johnson and Clemmons at a place nowhere near the trail of blood found on the ground, he changed his testimony about the location. This change was highlighted during the State's closing argument to the jury.

Seymour Abdullah also identified Bagby as the perpetrator, and it was during cross-examination of this witness that the State referred to Bagby as "conveniently dead." Tr. 448. According to Abdullah's version of the facts, however, it was Bagby, not Johnson, who had a collision with Clemmons, and Abdullah admitted that he saw no blood at the location of this collision. (The

-12-

importance of the collision, according to the theory of the defense, is that it provides an explanation for the blood on Clemmons's sweatshirt.)

The final witness was Keith Brown, the inmate who, according to Officer Steigerwald, ran away from the scene with Clemmons and ended up with Clemmons's hat and book in his cell. Brown testified that there was a scuffle, and that Johnson began running, with Bagby right behind chasing him. Brown was less certain about the collision. He thought that Johnson appeared to have bumped into Clemmons, or another inmate named Lewis, or someone else. He then left the scene but returned to pick up some papers of his own. It was then, he said, that he happened to see a hat and some papers lying on the ground, which he picked up and took to his cell. On cross-examination, he gave confused and evasive answers about his activities in the vicinity of the chapel. His version of the facts did not appear to be consistent with the location of the chapel door.

In his closing argument, counsel for the State stressed Officer Steigerwald's unequivocal identification of the defendant. He observed that the location of the trail of blood was inconsistent with the defendant's statement to Officer Brooks as to where he was standing when the victim, Johnson, brushed or bumped against him. Steigerwald had no reason to lie, counsel stressed, and there was no blood where the defense witnesses had placed the altercation. Counsel also referred to "the conveniently deceased Mr. Bagby," Tr. 500, but added that both Mays and Abdullah appeared to be uncertain as to whether Bagby or the victim collided with Clemmons. Towards the end of his argument, another reference was made to the fact that the defense witnesses were blaming the crime on a dead man. Tr. 504.

We take it that if the Clark memorandum had been used in cross-examining Captain Gross, as indicated above, the State would

-13-

have omitted the argument about Bagby's being dead at the time of trial - though it still might have been logical to point out that the three live witnesses actually called, Mays, Abdullah, and Brown, had waited until Bagby's death to accuse him.  However that may be, most of the State's case, including notably Officer Steigerwald's eyewitness account and Clemmons's arguable admission, would have been untouched.  We are acutely mindful that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." Burger v. Kemp, 483 U.S. 776, 785 (1987).  We take this responsibility extremely seriously, as the District Court did.  Having considered the matter with the care that it deserves, we are simply unable to say that our confidence in the verdict is sufficiently reduced.  The standard, unfortunately but perhaps necessarily, contains some element of subjectivity.  We suppose that any piece of evidence favorable to the defense - and the Clark memorandum certainly falls in this category - must have some tendency to undermine one's confidence level, so to speak.  It is dangerous and perhaps misleading to try to express these matters in quantitative terms.  The judgment we have to make is a qualitative one. The closest we can come to expressing it clearly is this:  as the case was actually tried, it seems to us that the defense had only a rather small chance of prevailing.  We do not think that the Clark memorandum would have increased this chance more than marginally.  We still have confidence in the verdict of guilty, and it is, accordingly our bounden duty to reject Clemmons's Brady claim.

                                III.


     We turn now to the other major contention made by Clemmons on this appeal - that his rights under the Confrontation Clause were violated by the use against him of the deposition of Captain A. M. Gross.  Clemmons's lawyer did not inform him of the deposition in advance, he was not present when it was taken, and he did not thereafter consent to its being used against him at trial.  (The

lawyer decided to take the deposition as a courtesy to Gross, whose wife had died immediately before the trial.)  We agree with the District Court that this contention, if open for decision on the merits in this federal habeas proceeding, would be a substantial one.  See Don v. Nix, 886 F.2d 203, 206 (8th Cir. 1989) (holding that "the right to be physically present when the accusations that the jury will hear are made" extends to pretrial depositions intended to be used at trial).

The District Court held, however, that the contention was procedurally barred by petitioner's failure to raise it in the proper fashion in the state courts.  Before addressing this issue directly, we briefly describe and put to one side two subsidiary contentions made by the parties.  First, the State argues that petitioner never actually made a Confrontation Clause claim in the District Court.  The claim, rather, was that petitioner's trial counsel had been ineffective for allowing the State to use a deposition taken when petitioner was not personally present.  We assume for present purposes that the District Court was correct in believing that petitioner had made a Confrontation Clause claim as such, and not just an ineffective-assistance claim based on counsel's failure to preserve his client's right of confrontation.

Second, petitioner argues that the State never pleaded "nonexhaustion" in the District Court with respect to his Confrontation Clause claim.  Any objection to consideration of the claim on its merits was, therefore, waived, the argument runs, and it was error for the District Court not to reach the merits.  We reject this argument.  We believe it rests on confusion between the doctrines of exhaustion and procedural bar.  It is true that the State did not plead nonexhaustion as a defense, but exhaustion refers to the present availability of state remedies.  If no state remedies are presently available for adjudication of a federal claim, exhaustion of remedies has occurred, and this is true whether the absence of state remedies is due to the state courts'

having already considered the claim, or to a petitioner's failure to raise the claim at some earlier, proper time. In other words, a claim that is procedurally barred is, by definition, an exhausted claim. The District Court's opinion does state that the claim "has not been exhausted before the Missouri courts, and has, therefore, been waived as procedural error under state law," slip op. 7, but we read this statement as simply an informal way of saying that the claim was never properly raised in the state courts and is therefore now procedurally barred. As the remainder of the District Court's opinion shows, that Court did not intend to say that the Confrontation Clause claim had been exhausted in the state courts, in the sense of having been raised and decided there. Quite the contrary: the District Court explained at length its reasons for holding that the claim had <u>not</u> been properly raised in the state courts, and that, therefore, it was procedurally barred. We now turn to this issue.

In his brief to this Court, petitioner argues that the claim was properly raised on direct appeal. The motion for new trial filed by counsel does refer to the right of confrontation, and petitioner's own pro se motion for new trial directly claims that "[t]he court denied defendant the right to confront his accuser, when the court allowed the State to read to the jury and into evidence the deposition of Mr. Gross." Brief for Appellant 35. However, appellate counsel on the direct appeal, not the same as trial counsel, did not raise the Confrontation Clause issue in her brief. Petitioner argues that the issue was preserved when he filed a motion to recall the mandate and claimed ineffective assistance of appellate counsel. As we understand Missouri practice, a motion to recall the mandate, at least on direct appeal, is a proper way (perhaps the only proper way) to claim ineffective assistance of appellate counsel. The trouble with this point for present purposes is that petitioner's motion, which we have examined, though it does charge appellate counsel with ineffective assistance in several respects, says nothing about the

-16-

Confrontation Clause. Nor does the motion refer to or incorporate any documents that would have alerted the Supreme Court of Missouri to the Confrontation Clause argument. The pages of the appendix which petitioner cites in this connection, 284-85, are entirely devoid of any reference to this issue. We do not think that a general allegation of ineffective assistance of appellate counsel, without elaboration, is sufficient to raise any particular instance of the allegedly ineffective assistance. Still less is a motion specifying certain grounds of ineffective assistance adequate to alert a court to any particular other ground. Petitioner's motion does claim that appellate counsel was ineffective in failing to brief as plain error "[t]he other allegations of trial counsel's ineffectiveness," App. 285, but nothing is said to particularize these grounds, nor, again, is any reference made to the Confrontation Clause or, indeed, to Captain Gross's deposition in any connection.

Petitioner has now filed a second motion to recall the mandate, and this motion does clearly refer to the Confrontation Clause issue. The Supreme Court of Missouri denied the motion on October 20, 1995, while this habeas case was pending before the District Court. The Supreme Court denied this motion without comment. We have no reason to believe that the denial was on other than procedural grounds. No authority has been cited, nor are we aware of any, that would support the filing of second or successive motions to recall the mandate. If such filings were permitted, there would be no particular incentive to include in one's first motion to recall the mandate all grounds of ineffective assistance of appellate counsel then known or available. The Missouri Supreme Court's order does not state that it is based on procedural grounds, but we believe we are safe in concluding that it was. There is simply no reason to conclude that the federal claims were rejected on their merits, or were interwoven with claims that were decided on their merits. See Jolly v. Gammon, 28 F.3d 51, 53 (8th Cir.), cert. denied, 115 S. Ct. 462 (1994). Petitioner also

-17-

attempted to raise this issue by original petition for writ of habeas corpus in the Missouri Supreme Court under Mo. Sup. Ct. R. 91, but, again, this petition was summarily denied without comment, and we have no reason to believe that this denial represented a ruling on the merits of the Confrontation Clause issue. See Byrd v. Delo, 942 F.2d 1226, 1231-32 (8th Cir. 1991).

Petitioner also contends that the Confrontation Clause issue is preserved for federal review by reason of having been urged in his state postconviction proceeding.[7]  The 29.15 trial court, in its findings and conclusions, rejected the argument on the ground that the Gross deposition was taken "with the consent of the Movant."  Respondent's Exhibit G, p. 235.  This finding was not supported by the record, there having been no testimony to support it, and no one now defends it.  Petitioner's problem is that there was no evidence in the postconviction record one way or the other on the issue.  At the postconviction hearing in state court, petitioner testified, but he said nothing about not having been given an opportunity to be present during the Gross deposition.  Petitioner's counsel did not call trial counsel.  He testified only when called by the State, and his testimony did not include any reference to petitioner's presence vel non at the Gross deposition.  Indeed, as the District Court remarked, slip op. 8 n.6, the

---

[7]We assume, without deciding, that ineffective assistance of direct-appeal counsel can be raised in a 29.15 postconviction petition.  We observe that the assumption seems questionable.  We are aware of no authority so holding, and the appellate court, which unquestionably can consider the issue on motion for recall of mandate, would be more familiar with counsel's performance before it.  In addition, if I can raise the point in my 29.15 petition anyway, why bother to move the appellate court to recall its mandate?  On the other hand, the 29.15 trial court in the present case did consider the Confrontation Clause issue and reject petitioner's claim on the merits, so the claim, absent some other default, would be cognizable on habeas in the present case even if state procedural law would not normally allow it in a 29.15 proceeding.  See, e.g., Hadley v. Caspari, 36 F.3d 51 (8th Cir. 1994) (per curiam).

"dispositive finding [that petitioner had consented to the Gross deposition] does not seem to have been challenged by petitioner or counsel prior to the proceeding in this court."

As we have previously noted, those who would attack a conviction are obligated to develop the material facts in the state courts. "[A] state prisoner's failure to develop material facts in state court" can be excused only if petitioner demonstrates cause for this lack of development, and prejudice resulting from it. See Keeney v. Tamayo-Reyes, supra, 504 U.S. at 8. Prejudice there may be, due to the evident substantiality of the Confrontation Clause issue, but we see no "cause" as that word has come to be defined in the cases. It may have been inexcusable neglect, in the sense of a lawyer's obligation to a client, not to have either petitioner or trial counsel testify that Clemmons had not agreed to the use at trial of the Gross deposition, but this sort of omission by postconviction counsel cannot, as a matter of law, qualify as "cause." See, e.g., Coleman v. Thompson, supra; Nolan v. Armontrout, supra.

Petitioner points out that he attempted to bring the issue to the attention of the Missouri Supreme Court, first by instructing postconviction appellate counsel to raise it, and then by filing his own pro se brief incorporating pleadings that raised it. As we have held in part II of this opinion, these efforts by petitioner were, in our view, sufficient to present the issue to the Missouri Supreme Court. The problem is that there was nothing, factually speaking, to present. If the Missouri Supreme Court had addressed the Confrontation Clause claim, there would have been no testimony or other evidence before it to justify a reversal of the 29.15 trial court.

No doubt all of this seems more than somewhat technical. The basic principle, however, is simple and easily understood: in order to get a federal habeas court to consider on its merits an

attack on a state-court conviction, the facts said to justify the attack must first have been fully developed in the state courts, unless a petitioner can show some good reason, recognized in the law, that prevented him from doing so.  The state courts are and must be the primary forum for the administration of the criminal law, and a due regard for their competence requires us to respect those procedural rules that require the underlying facts, absent some adequate cause, to be presented in the first instance in the state system.

IV.

For the reasons we have attempted to explain in this opinion, the judgment of the District Court, dismissing with prejudice the petition for writ of habeas corpus, is affirmed.  The <u>Brady</u> claim is rejected on the merits.  The Confrontation Clause claim is procedurally barred.  We thank appointed counsel for petitioner for their diligent and able service.

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.