# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3604SI

_____

Sherman White,

              Appellant,

v.

James Helling, Acting Warden,
Iowa State Penitentiary,

              Appellee.

On Appeal from the United
States District Court
for the Southern District
of Iowa.

_____

Submitted: June 15, 1999

Filed: October 19, 1999

_____

Before RICHARD S. ARNOLD and LOKEN, Circuit Judges, and BYRNE,[1] District
    Judge.

_____

RICHARD S. ARNOLD, Circuit Judge.

      A jury convicted Sherman White of two counts of robbery with aggravation,
three counts of murder, and two counts of assault with intent to commit murder. White
was sentenced to three terms of life imprisonment without parole, two terms of thirty

_____

[1]The Hon. William Matthew Byrne, Jr., United States District Judge for the
Central District of California, sitting by designation.

years' imprisonment, and three terms of twenty-five years' imprisonment, all to run concurrently. White's conviction and sentence were affirmed in his initial appeal, and upheld again when he sought postconviction relief. See State v. White, 223 N.W.2d 173 (Iowa 1974); White v. State, 380 N.W.2d 1 (Iowa App. 1985).

White then filed a petition for habeas corpus relief. The District Court denied the petition, and later denied White's motion to reconsider. White now appeals. He raises a number of issues in his appeal, including a claim that material, exculpatory evidence was withheld by the state and a claim that he received ineffective assistance of counsel. We hold that material exculpatory evidence was withheld from White, the state trial court, and the jury. White must be released or given a new trial.

I.

On January 19, 1972, White and five other men were involved in a robbery at the Shamrock Tavern in Davenport, Iowa.[2] The bartender and two of the bar's patrons were shot and killed during the robbery. Other patrons at the bar were also injured. White himself did not shoot or assault anyone. White was tried separately from the other defendants and raised a coercion defense at his trial. The jury apparently did not believe that White had been forced to participate in the robbery, however, and found him guilty of eight felonies.

Other facts of the case are relevant to the various claims that White is pressing on appeal, but we think the issues can be best understood if we state these facts in connection with the discussion of each individual issue.

---

[2]The five other men involved in the robbery were Glenn McGhee, Tommy Cunningham, Eugene Orr, Clayton Vesey, and Michael Mann. Mann was the only one not charged. The State appears to have accepted his contention that whatever part he played was coerced. The other defendants received sentences of varying lengths.

II.

White argues that a statement he made to the police on March 9, 1972, confessing to his involvement in the crime, was not voluntary.[3] On the morning of the second day of his trial, White moved to suppress the statement. White argued that the police officers induced him to give his statement with a promise of leniency - that he would be prosecuted only for the robbery, and not the murders. White's trial counsel was apparently not aware of this claim until the morning of the second day of the trial. The court, with the agreement of both parties, decided to defer a suppression hearing until the state was ready to introduce the statement. Both parties agreed not to make any references to the statement until after the hearing. During the state's opening argument, however, and again during its cross-examination of White, the state did refer to information contained in the statement. White's counsel did not object, and the court never held a suppression hearing. White's lawyer had apparently decided in the meantime that parts of the statement were favorable to his client, and that it was just as well for the statement, or parts of it, to come in.

White argued in the post-conviction proceeding in the state courts that use of the statement violated his rights because, having been made in response to a promise of leniency, the statement was involuntary and therefore inadmissible as a matter of federal constitutional law. But the Iowa Court of Appeals found that "the statement was voluntarily given because it was not induced by a promise of leniency . . .." White

---

[3]The State argues that this point was procedurally barred. The involuntariness of the statement, it says, was never argued in the state courts as such, but only in the context of a claim that White's trial counsel was ineffective for not having properly objected to the use of the statement. We do not stop to resolve this procedural-bar argument, because the state court's finding that the statement was voluntary, which we discuss in text, is sufficient to dispose of both the involuntariness claim and its ineffective-assistance derivative.

-3-

v. State, 380 N.W.2d at 4.  This finding has fair support in the record and is therefore binding on a federal court exercising habeas jurisdiction.  The written statement itself recites that "[n]o threats or promises have been made to me to induce me to furnish a statement."  Appellee's Appendix (App.) 113.  An officer present at the time testified that he made no promises to White.  App. 80.  And White's own testimony about the alleged promise of leniency was somewhat equivocal.  At one point in his testimony he indicated merely that he was "under the impression that I wouldn't be prosecuted." App. 98.  Only later, in response to a leading question from his lawyer, did White specifically claim he had been promised he would be charged only with robbery, and not  murder.  We hold that the state court's finding that the statement was not induced by a promise of leniency is fairly supported by the record.  We therefore reject petitioner's first argument.

## III.

Petitioner's next argument relates to the alleged misconduct of a juror, Mrs. Mary Voss.  During the trial, a member of the defense team observed the juror conversing with a spectator, Mrs. Marian Forsythe.  Defense counsel promptly reported the conversation to the court, and a hearing was held in chambers.  It developed that the spectator was a sister of one of the murdered men, so, on its face, the conversation was a matter of concern.  The juror testified that she had known the spectator from 18 years earlier, that she had not known that the spectator was related to one of the victims, that she was merely inquiring about the health of Mrs. Forsythe's child, and that they did not discuss the case.  She further stated that the conversation would have no bearing on her decision as a juror.  The court denied the defense motion for a mistrial and admonished Mrs. Voss to have no more conversations of the kind.

Petitioner argues that his trial counsel was ineffective for not going more deeply into the matter.  Counsel, it is said, should have called Mrs. Forsythe to testify in chambers about the circumstances and content of the conversation.  Our initial inquiry

is whether counsel's omission caused his representation of Mr. White to fall below acceptable professional standards. See Strickland v. Washington, 466 U.S. 668 (1984). We must resist the temptation to use hindsight to require that counsel's performance have been perfect. Only reasonable competence, the sort expected of the "ordinary fallible lawyer," Nolan v. Armontrout, 973 F.2d 615, 618 (8th Cir. 1992), is demanded by the Sixth Amendment. Having weighed the matter carefully, we believe the Iowa Court of Appeals was correct in stating as follows:

> [W]hile petitioner's brief indicates certain aspects of this issue could have been handled more favorably for petitioner, we are unwilling to find that trial counsel's conduct was outside the bounds of normal competency.

White v. State, 380 N.W.2d at 5.

In a related contention, petitioner claims not merely that his trial lawyer was insufficiently diligent in exploring the issue, but that the juror said she was biased in fact. During the in-chambers proceeding we have referred to, Mrs. Voss testified unequivocally that, before the conversation in question, she had not even known that Mr. Forsythe had a brother, let alone that her brother was one of the victims of the crime. "I never knew she had a brother. Never knew her maiden name or anything." App. 68. The juror did not know of the relationship between the spectator and the murder victim until the court, at the beginning of the in-chambers proceeding, informed her of this fact.

Later, petitioner was able to develop some evidence to the contrary. During post-conviction proceedings in the state courts, Mrs. Voss, who was called again to testify, this time on deposition, first said she did not know if the conversation had taken place before or after she was selected to sit on the trial jury. This is important because, during voir dire, standard questions about acquaintance between potential jurors and

any friends or relatives of victims of a crime had been put, and Mrs. Voss had not responded to these questions. So, if in fact she had conversed with Mrs. Forsythe before being selected to sit on the jury, an inference might be drawn that she had concealed information on voir dire. (It is also possible that, even if the conversation took place at the earlier point, Mrs. Voss did not realize the relationship until being informed by the court at the later in-chambers proceeding.) Mrs. Voss then followed up this testimony by saying that she was "pretty sure [the conversation] was before [she was] chosen as a juror." App. 111. Mrs. Forsythe, moreover, apparently testified that the conversation took place before Mrs. Voss was sworn in as a juror. App. 112. On the other hand, Brenda White, the petitioner's sister, testified that conversations she observed between the juror and Mrs. Forsythe took place after the jury had been selected. App. 94. Perhaps, as petitioner urges, several conversations, not just one, took place, but the record is equivocal. Again we agree with the Iowa Court of Appeals:

> Despite the inconsistencies highlighted by White, even at this juncture, conflicting testimony persists as to when the conversation occurred and whether the juror's judgment was skewed as a result of the conversation.

380 N.W.2d at 5. In this habeas corpus case, petitioner is attempting to upset the judgment of a court of competent jurisdiction, and the burden is on him to establish facts that would justify such relief. We conclude that he has not done so.

IV.

Petitioner's next point concerns the efforts of his trial lawyer to exclude the in-court identification made by one of the surviving victims of the crime, Al Stouffer. This witness was playing cards with friends in the Shamrock Tavern the night the robbery took place. He was ordered to hand over his wallet and to lie on the floor. At trial, he

identified petitioner as the man to whom he gave his wallet. Petitioner now argues that this in-court identification should have been excluded under Manson v. Brathwaite, 432 U.S. 98 (1977), because it was the result of impermissible suggestion by the police, suggestion that created a very substantial likelihood of misidentification. The question is what trial counsel did to try to keep this testimony out, and whether what he did met the Strickland standard of reasonable professional conduct.

At trial, counsel in fact did object to the introduction of this testimony. Procedures used during a line-up were placed in issue, and a police officer was called to testify about them. The Court then overruled the defense objection. Later, counsel moved to strike the identification testimony, claiming that the witness himself had conceded that he had first identified petitioner, during a pre-trial interview by the police, after being shown a single photograph of petitioner. The trial court never formally ruled on this motion, but the testimony was not stricken, so the motion was, in effect, denied. The nature of the procedures used with the witness before trial was in dispute. He did testify that he had seen a photograph of petitioner, but also stated that he had been shown other photographs at the same time. Further, the witness said that no one had tried to prompt him or to lead him to an identification.

Petitioner's principal criticism of his trial counsel is that no pretrial motion to keep the identification out was made, and, therefore, no evidentiary hearing on the question, outside the presence of the jury, was ever held. We can readily agree that it would have been better practice to make such a motion, but we are not convinced that there is a reasonable probability that such a pretrial hearing would have resulted in a decision to exclude the testimony. If we look at some of the factors courts weigh in deciding issues of this kind, see Neil v. Biggers, 409 U.S. 188, 199-200 (1972), we can see that Stouffer had a good look at the man who asked for his wallet, that, when he testified in court, he was paying a high degree of attention, and that he was positive that White was the person who had asked him for his wallet. Trial counsel made considerable headway in his cross-examination of Stouffer, but, in the end, the witness

stood firm: he was "[p]retty sure" that White had been the man who demanded the wallet, and was "[p]ositive in my mind" on that subject. App. 57. On the whole, we are persuaded that the accuracy of Stouffer's identification of White was a question properly left to the jury, which heard all of the cross-examination and was able to weigh Stouffer's demeanor and degree of assurance. We stress that in coming to this conclusion we consider only the facts and circumstances that were available to trial counsel at the time. Other facts have since come to light, facts that we will discuss in detail in the next section of this opinion, but, for purposes of the present point, which concerns only the performance of trial counsel, we must lay these subsequently discovered facts to one side.

For these reasons, we reject petitioner's contention that his trial lawyer was ineffective in a constitutional sense in connection with the in-court identification made by Al Stouffer.

V.

We come at last to the most troubling part of the case, petitioner's contention that the State withheld from him evidence that would have cast substantial doubt on Mr. Stouffer's testimony. To put this issue into context, we need at this point to recount the procedure followed by the District Court with respect to the claim of withheld evidence.

With leave of court, counsel for White in the habeas proceeding conducted discovery. New evidence, never before revealed, came to light. This evidence included six exhibits, now numbered petitioner's exhibits 2-7. They are in the record before this Court. App. 103-09. The exhibits consist of notes and memoranda from police files. Petitioner made a motion to expand the record to include this new material. The District Court initially granted the motion, but then, in response to a motion for reconsideration filed by the state, reversed itself and refused to include the

-8-

new material in the record. The basis of the state's motion was the Supreme Court's decision in Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992), which, the State argues, prohibits receipt of evidence by a federal habeas court if the evidence had not been offered in the state courts, absent a showing of cause and prejudice.

In addition, after the District Court entered judgment dismissing the petition, counsel for petitioner filed a timely motion under Fed. R. Civ. P. 59(e) to alter or amend the judgment. Petitioner himself filed a pro se "motion for a new trial." In this submission, petitioner, among other things, complained that his habeas counsel had failed to raise the issue of knowing and intentional withholding of exculpatory evidence by the Scott County Attorney. The District Court treated petitioner's submission as a supplement to the Rule 59(e) motion submitted by counsel. The court denied the motion, holding, with respect to the claimed failure to disclose exculpatory evidence, that it had already dealt adequately with the issue.

In our view, it was error for the District Court to refuse to expand the record as requested. In the first place, Keeney, the State's main reliance, does not erect an absolute barrier to the receipt of new evidence by a habeas court. As we have held, see Clemmons v. Delo, 124 F.3d 944, 951 (8th Cir. 1997), cert. denied, 118 S. Ct. 1548 (1998), Keeney holds only that a district court is not required to hold an evidentiary hearing, or otherwise consider new evidence, when that evidence, though reasonably available at the time, was not offered in the state courts, unless a petitioner can show cause for the failure to offer the evidence, and prejudice resulting from the failure.[4] Notwithstanding the failure to offer evidence in the state courts, a district court still

---

[4]Though we hold that error was committed, we cannot fault the District Court too much for its interpretation of Keeney. We ourselves initially misunderstood the case. See Clemmons v. Delo, 100 F.3d 1394, 1403 (8th Cir. 1997), vacated on rehearing, 124 F.3d 944, 951 (8th Cir. 1997), cert. denied, 118 S. Ct. 1548 (1998).

had[5] discretion to receive it, and it may choose to do so under proper circumstances. Furthermore, the very point urged by petitioner here is that the evidence in question, documents from police files, was not previously made available to him, though the prosecution had a duty, under Brady v. Maryland, 373 U.S. 83 (1963), to make the information available if it was exculpatory. See Strickler v. Greene, 119 S. Ct. 1936, 1952 (1999) (prosecution's withholding of exculpatory evidence contributed to petitioner's establishing cause for failure to raise Brady claim prior to federal habeas). In this Court, the state does not argue that the evidence was reasonably available to petitioner at any point before the filing of the federal habeas case, nor does it assert any excuse for not having revealed the evidence to counsel for petitioner before trial, the time when an obligation under Brady attaches. Instead, the state argues simply that the evidence was not exculpatory, and even this argument is confined to one item of evidence, an alleged statement by Michael Simmons, a classmate of the defendants, to the effect that a planning meeting had been held among co-defendants without White's being present.

So we turn to the question whether the newly discovered evidence is exculpatory, and, if so, whether it is material to the question of White's guilt. The government violates a defendant's right to due process when it suppresses evidence "favorable to the accused . . . where the evidence is material either to guilt or to punishment . . .." Brady v. Maryland, 373 U.S. 83, 97 (1963). To establish a Brady violation White must show that the government suppressed evidence, that the evidence was exculpatory, and that the evidence was material to his guilt or punishment. See United States v. Ryan, 153 F.3d 708, 711-12 (8th Cir. 1998). Under Brady, evidence

---

[5]We use the past tense because this case is being decided under the pre-AEDPA (Anti-Terrorism and Effective Death Penalty Act) habeas statute. Compare 28 U.S.C. § 2254(d) (1994), with 28 U.S.C. § 2254(e)(1999). In general AEDPA does not apply to habeas petitions filed before April 24, 1996, its effective date. See Lindh v. Murphy, 521 U.S. 320, 327 (1997).

is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." Id.

We are not much impressed by the Simmons statement. In the first place, the record, even as expanded, is not clear as to exactly what Mr. Simmons may have said that would be helpful to petitioner. For present purposes, we accept petitioner's version of this new evidence: that Simmons stated that the robbery had been planned at a meeting at which White was not present. This evidence, White argues, would have supported his defense of coercion. It would have shown that his participation in the affair was merely an afterthought, and would have helped him distance himself from the other participants. This particular plan, though, had in view the robbery of another tavern, the B & B. Later, in White's presence, another meeting was held, and the objective was changed to the Shamrock Tavern. Thus, notwithstanding the possible import of the Simmons testimony, White clearly was present during the planning of the robbery that actually took place. The Simmons testimony, in our view, though perhaps marginally exculpatory, would not have done White a lot of good.

Other items of newly discovered evidence, however, are much more significant. As we have noted, a major piece of evidence against White was the testimony of Allan C. Stouffer that White was the person to whom he gave his wallet. Some doubt was thrown on Stouffer's testimony by cross-examination, but the jury might still have believed it. Such evidence would be a powerful argument against a defense of coercion. The more active White's participation in the proceedings, the less believable his claim that he was forced to participate. He himself testified that he merely stood by the door.

A number of aspects of the newly discovered evidence directly attack the credibility of the Stouffer identification. This evidence, for example, contains a police

memorandum dated March 1, 1972, and entitled "EVIDENCE THAT WE NOW HAVE." This memorandum contains the following line:

(b) Stouffer - nothing on identification.

Later in the memorandum, the "[p]ossibility that victims Arnee and Abbott could make positive identification," is mentioned, but nothing is said to indicate even a hope that Stouffer could do so. Petitioner's exhibit 3, App. 104.

Petitioner's exhibit 4, App. 105-06, apparently reflects the results of a later interview of Stouffer. He was shown photographs of 15 people, including Sherman White. The memorandum reports as follows:

> Showed Mr. Stouffer the group of Muggs listed above. After we informed him that we knew all of the people involved, Mr. Stouffer picked out the muggs of Eugene Orr, Tommy Ray Cunningham, and Glenn McGhee.
>
> He could not make positive identification at this time, but recalls seeing this group in the tavern.
>
> Mr. Stouffer believes the man who kicked the table is the one who took his wallet... .
>
> He picked Tommy Cunningham as the man who kicked the table, and believed to have taken his wallet.
>
>  . . .
>
> NOTE: We believe if this man is coached properly, he could remember much more, but he is very afraid for himself and his family.

-12-

App. 106 (emphasis ours).

A Davenport Police Department memorandum dated three days later, March 18, 1972, reflects an interview with Tommy Ray Cunningham. He appeared to admit guilt of armed robbery:

> He admitted being inside the tavern, took two billfolds from a couple of the men on the floor, and also taking the money tray from Glen McGhee and go out of the tavern.

App. 107. Thus, Cunningham apparently admitted that it was he, and not White, who took Mr. Stouffer's billfold.

Three days after that, a line-up was held, and on this occasion the witness Stouffer stated that he was "almost sure" of two of the participants, Eugene Orr and Sherman White. This is the first time, so far as the evidence before us now reflects, that Mr. Stouffer had identified petitioner. Perhaps significantly, on this same occasion he stated he was "not positive" about Tommy Cunningham. Petitioner's exhibit 6, App. 108.

Almost two months later, and shortly before the trial, Mr. Stouffer was re-interviewed. The police department memorandum, Petitioner's exhibit 7, App. 109, contains the following statement:

> Al Stouffer went over the same five mugg shots, he picked out Sherman White No. 21,824, as the man he gave the billfold to, before laying [sic] on the floor. That was his billfold.

-13-

This sequence of events, withheld from the defense at the time of the trial, would have provided powerful ammunition for attacking the credibility of Mr. Stouffer's in-court identification of petitioner as the man who took his wallet. Indeed, the inference of suggestiveness is so strong that the evidence might have led the trial court to exclude the Stouffer identification altogether. Is the evidence material, in the Brady sense? Is there a reasonable probability that, if this evidence had been used by the defense at trial, the result would have been different? Is our confidence in the result undermined? These questions, sometimes misleadingly referred to as "tests," have to be answered. They are not easy. They demand the exercise of judgment and the careful assessment of arguable positions on both sides.

The Iowa Court of Appeals thought White's coercion defense "was credible, given White's testimony," 380 N.W.2d at 5. We agree. White testified that McGhee, who had reason to hate him because of White's having given evidence in another case against a friend of McGhee's, came to his house, made White give him shotgun shells, and told White that he, White, was going to go for a ride with McGhee and the other defendants. White claimed that he was afraid that McGhee would kill him if he did not follow orders. The State, on the other hand, had substantial evidence to rebut this defense. White did "case" the Shamrock Tavern before the crime took place, and he did, by his own admission, enter the tavern with the robbers. After the robbery, he participated in the disposal of the weapons, cash drawer, and cash.

It is not our job to determine whether White in fact was coerced. That was for the jury, which apparently did not believe White's version. But the in-court identification by Stouffer, an identification that the newly discovered evidence, if believed, would render highly vulnerable, was a strong argument on the State's side. The State argues that the new documents, the memoranda from police files, would not themselves have been admissible, and this may be correct. Those documents, though, would surely have been the basis for further investigation, and could at the very least have been used to impeach police witnesses on the subject of the circumstances of

-14-

Stouffer's preparation for testimony and pretrial identification of White. Significantly, trial counsel for White, on cross-examination, asked Stouffer if he had ever identified Tommy Cunningham, and the witness replied, "I don't think so," and then, "I don't remember." App. 48. If the police notes that have now come to light are to be believed, this testimony was very likely false. On reflection, it is our view that the newly discovered evidence would have made a difference, and that the difference is great enough to meet the <u>Brady</u> materiality standard, that is, great enough to show a reasonable probability - not merely a possibility - that the result of this case would have been different. See <u>Strickler v. Greene</u>, 119 S. Ct. at 1952.


VI.


It follows that Mr. White is constitutionally entitled to a new trial. Whether such a trial is even possible at this late date, we do not know. The crime was committed, and the trial held, in 1972. Sherman White has been in prison for 27 years after a trial in which the State withheld material evidence that would have helped him.[6] The judgment of the District Court is reversed, and the cause remanded to that court with instructions to issue the writ of habeas corpus, freeing Mr. White from custody, unless, within such reasonable time as the court may fix, the State commences proceedings for a re-trial.

It is so ordered.

---

[6]The long pendency of this case in the courts, state and federal, reflects no credit on the judicial system.

A true copy.

Attest:

    CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.