United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**
No. 96-1086WM

| | |
|---|---|
| Eric Clemmons, | * |
| | * |
| Appellant, | * |
| | * On Appeal from the United |
| v. | * States District Court |
| | * for the Western District |
| | * of Missouri. |
| Paul Delo, | * |
| | * |
| Appellee. | * |

_____

Submitted: July 21, 1997

Filed: August 28, 1997

_____

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Circuit Judge,
and KORNMANN,* District Judge.

_____

RICHARD S. ARNOLD, Chief Judge.

In 1987, Eric Clemmons was convicted and sentenced to death for the murder of a fellow inmate at the Missouri State Penitentiary. Exculpatory evidence was apparently withheld from Clemmons by the State prior to his trial. In addition, evidence that was important to the State's case came in by deposition, raising serious

_____

*The Hon. Charles B. Kornmann, United States District Judge for the District of South Dakota, sitting by designation.

issues under the Confrontation Clause.  After exhausting his state remedies, Clemmons filed this petition for a writ of habeas corpus in the United States District Court for the Western District of Missouri.  While the District Court agreed that the above two claims probably warranted reversal of Clemmons's conviction, it found that they were procedurally barred and therefore denied Clemmons's petition.  This appeal followed, and we affirmed.  100 F.3d 1394 (8th Cir. 1996).  Clemmons then filed a petition for rehearing by the panel.  We granted the petition,[1] thus vacating the initial panel opinion and judgment, and now reverse the judgment of the District Court.

I.

The District Court and the Missouri Supreme Court have rendered careful and detailed opinions reciting the facts in this case.  Clemmons v. Delo, No. 90-0943-CV-W-6  (W.D. Mo., July 7, 1995) (Memorandum and Order); State v. Clemmons, 753 S.W.2d 901 (Mo.) (en banc), cert. denied, 488 U.S. 948 (1988).  We will summarize them here only to the extent necessary for our review.  On August 7, 1985, Clemmons was an inmate at the Missouri State Penitentiary.  Shortly before 9:00 that evening, Corrections Officer Thomas Steigerwald, while walking towards a group of inmates standing near Housing Unit 3, observed one of the inmates grab another, strike him in the chest, and then hit him with a roundhouse punch in the side.  Henry Johnson, the inmate who had been struck, ran past Steigerwald to the entrance to the main corridor.  As he did so, Steigerwald noticed blood on Johnson's shirt.  It was then that Steigerwald realized that a stabbing had occurred.ENDFIELD

---

[1]Two principal concerns led us to take the unusual step of granting rehearing by the panel.  First, the petition for rehearing pointed out that, contrary to our earlier view, see 100 F.3d at 1403, petitioner had in fact presented evidence crucial to his Confrontation Clause claim to the state post-conviction court.  See infra at 19.  Second, we had not properly understood Missouri evidence law, a mistake that caused our analysis of the prejudice caused by the Brady violation to be flawed.  Compare 100 F.3d at 1397-98, with infra at 9-10.

Steigerwald called for backup on his radio and began to pursue the inmate whom he had seen striking Johnson. That inmate, who was wearing a gray sweatshirt, and another inmate, who was wearing a gray towel around his head, began to move towards the prison chapel. Eventually, these inmates separated, and Steigerwald decided to pursue the one in the gray sweatshirt. He testified that he saw the faces of both inmates, as well as a knife in the hand of the inmate in the gray sweatshirt.

Steigerwald eventually caught up with the inmate in the sweatshirt, who was Clemmons. By that time the sweatshirt had been turned inside out so that it appeared to be white. There was human blood on the gray part of the sweatshirt, though it could not be typed. No knife was ever found.

The inmate in the gray towel was also caught. When his cell was searched, a hat and a school book belonging to Clemmons were found. The book was splattered with blood. The inmate had been seen entering the housing unit carrying the hat and the book shortly after the stabbing. The blood splatters on the hat were human blood of either type B or type AB. Johnson, the victim, had type B blood.

Johnson later died. An autopsy revealed that he had been stabbed three times. The fatal blow was to the left side of his chest and penetrated his heart. He also sustained a stab wound to his left side and another under his right arm. A scratch on his shoulder was also discovered, but it is uncertain whether the scratch was inflicted at the same time as the three stab wounds. Prior to the death, Johnson exclaimed, "they have stuck me in my heart."

Clemmons was charged with murdering Johnson. At his trial, there were two pieces of particularly damaging evidence against him. The first was Steigerwald's testimony identifying him as the person who struck Johnson and as having a knife. The second was testimony from Captain A. M. Gross that Clemmons had stated in Gross's presence, "I guess they got me." Clemmons's defense was that another inmate, Fred

Bagby, had killed Johnson, and several inmates testified more or less to that effect. According to Clemmons, what Steigerwald saw was Johnson running into Clemmons after Bagby had already stabbed Johnson. Bagby had died by the time of trial, and the State argued that the testimony of Clemmons's witnesses should be discounted because it was easy for them to try to help Clemmons by blaming someone (Bagby) who could not defend himself.

Clemmons was found guilty. In the penalty phase, several aggravating circumstances were alleged. Most notably, Clemmons was a prisoner under sentence of life imprisonment without possibility of parole for 50 years for another murder when Johnson was killed. The jury sentenced Clemmons to death.

## II.

Clemmons alleges that exculpatory evidence was withheld from him prior to his trial in violation of Brady v. Maryland, 373 U.S. 83 (1963). Following Clemmons's direct appeal, he discovered an important piece of evidence. On the very day that Johnson was killed, a Department of Corrections inter-office communication was written by Captain A. M. Gross, the same Captain Gross who testified against Clemmons, stating that another inmate had accused Fred Bagby of killing Johnson. The inter-office communication read as follows:

> On the above date at approximately 9:30 P.M. I was searching the upper yard for evidence in the stabbing that had taken place about 8:55 P.M. on inmate Johnson, Henry . . . when I met and interviewed inmate Clark, Dwight . . .. Clark said that he had witnessed the assault on Johnson, and that he had seen two (2) men stabbing Johnson. He described both assailants as being black, and he thought one was inmate Fred Bagby but only knew the second inmate by sight. When questioned in detail Clark did not make sense

and further investigation reflects that Clark's statement is untrue.

This evidence was not provided to Clemmons's attorney, despite a discovery request for "[a]ny material or information . . . which tends to negate the guilt of the defendant."[2]

Clemmons raised the failure to disclose this memo in his initial postconviction motion under Rule 29.15 of the Missouri Rules of Criminal Procedure. The memo itself was introduced in evidence at the 29.15 hearing without objection from the State. Clemmons did not, however, call Clark as a witness, even though he had subpoenaed Clark, and Clark was available to testify. In fact, Clemmons himself specifically chose not to call Clark as a witness.

The 29.15 court denied Clemmons's motion, but did not discuss the Brady issue. Clemmons then appealed to the Missouri Supreme Court. See Clemmons v. State, 785 S.W.2d 524 (Mo.) (en banc) (affirming denial of postconviction relief), cert.denied, 498 U.S. 882 (1990). There, however, his lawyer, contrary to repeated instructions from Clemmons, failed to raise the issue of the undisclosed evidence. Clemmons, in an effort to save the issue, attempted to file a pro se supplemental brief with the Missouri Supreme Court, but his motion for leave to file the brief was denied.

Clemmons once again raised the Brady issue in his petition for a writ of habeas corpus before the District Court. That Court held that the claim was procedurally barred.

---

[2]The State contends that the memorandum was in Johnson's inmate file, which was reviewed by trial counsel for Clemmons. We agree with the District Court that "[t]here is little need to resolve the [issue]." Memorandum and Order 13. "[I]f the memorandum was in the victim's file, but was not examined or was discounted by [trial counsel]," ibid., a claim of ineffective assistance of counsel would arise that would be just as strong or weak, as the case may be, as the Brady claim Clemmons now presses.

A.

Clemmons's initial difficulty stems from the fact that the Brady issue was not raised in the appeal from the denial of postconviction relief. Omission of this issue was a serious mistake by Clemmons's appointed counsel, perhaps the sort of mistake that, if committed at trial or on direct appeal, would amount to ineffective assistance in violation of the Sixth and Fourteenth Amendments, but error of this kind on the part of postconviction counsel cannot be "cause" to excuse a procedural default. See Coleman v. Thompson, 501 U.S. 722, 753 (1991); Nolan v. Armontrout, 973 F.2d 615 (8th Cir. 1992).

What we have here, however, goes beyond a mere omission on the part of counsel. After counsel had been appointed to represent Clemmons on his 29.15 appeal (counsel different from the lawyer who had represented him in the postconviction trial court) Clemmons wrote the new lawyer to request that he be kept informed. He specifically stated that he wanted all of his issues preserved. Appointed counsel, however, filed a brief in the 29.15 appeal without giving Clemmons an opportunity to review it and without including in the brief all of the issues previously raised in the trial court. Petitioner then wrote counsel and instructed him to file a supplemental brief raising the additional issues. Clemmons specifically drew the attention of counsel to the danger that issues not raised would later be held not to have been properly presented. "I want you to lay the ground work so if the Missouri Supreme Court refuse [sic] to hear [the unbriefed issues] the record will clearly show we tried to present them." Letter of December 26, 1989, App. 270. Counsel refused, stating that he had "made every argument on your behalf that I felt could be supported by law and evidence." Letter of December 29, 1989, App. 271.

Clemmons then made a motion in the Missouri Supreme Court for leave to file a supplemental brief pro se. This motion recites that appointed counsel had filed a brief raising only six points, that Clemmons had requested in writing that every other ground

preserved by the record also be raised, and that counsel had refused this request. The motion further states that no fewer than 130 additional points should have been raised. It asks the Court to accept a number of documents "as a supplemental brief in this cause," including the original and first amended 29.15 motions, both of which documents, presumably, were in the record before the Missouri Supreme Court. The Court denied the pro se motion without comment. The documents referred to in the motion included the <u>Brady</u> issue now under discussion.

As noted above, we agree with the State that mistakes made by counsel in postconviction proceedings do not constitute "cause" for habeas purposes. The initial question, though, is not whether there was cause to excuse a procedural default, but whether there was a default in the first place. In other words, did Clemmons fairly present his <u>Brady</u> claim in the state courts? In the perhaps unique circumstances of this case, we think the answer is yes.

It is perfectly true that counsel does not have to present every issue appearing in the record. In fact, it could be bad lawyering to do so, especially when there are so many potential issues. As counsel remarked in his letter to Clemmons, "[y]ou can't expect every single allegation to hold up in court, and it's not the number of allegations that matters anyway. One good issue is better than a thousand others." App. 271. The client, however, is and always remains the master of his cause. Here, Clemmons did the only thing he could do: he tried to bring the issue to the attention of the Missouri Supreme Court himself. We do not criticize that Court for refusing leave to file the supplemental brief. Such matters are within the Court's discretion.[3] Our own practice

_____

[3]No rule of court or reported Missouri case of which we are aware specifies the circumstances under which Missouri appellate courts allow pro se briefs. A state procedural rule must be regularly adhered to if it is to be an adequate state ground supporting a procedural bar. <u>E.g.</u>, <u>James v. Kentucky</u>, 466 U.S. 341, 348-51 (1984). Sometimes Missouri courts allow pro se briefs, and sometimes they do not. That is their prerogative. But in the absence of regularly applied criteria, the decision not to

is usually to refuse leave to file supplemental briefs in cases in which counsel has appeared. The fact remains that Clemmons called the attention of the Missouri Supreme Court to his <u>Brady</u> claim, among many others. We do not know what else he could have done, as a practical matter, to present the claim to that Court for decision on the merits.[4] We therefore hold that the claim was fairly presented, and that the merits are now open for decision on federal habeas corpus.

B.

Whether framed as an ineffective assistance of counsel claim or as a <u>Brady</u> claim, Clemmons's claim undeniably states a constitutional violation. The next question, which we now address, is what facts we may properly consider to determine whether there is a reasonable probability that the outcome of the trial would have been different if the Gross memorandum had been produced prior to trial. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.) (adopted by the

---

allow such a brief cannot be said to rest on a regularly applied rule of state procedural law.

[4]At the evidentiary hearing on this habeas petition, the District Court suggested that Clemmons could have fired his lawyer and then filed his pro se brief. No doubt a client can always discharge his lawyer, but the suggestion does not seem practical in the present circumstances. When Clemmons learned, after the fact, that his lawyer had violated his instructions by filing a brief omitting issues the client wanted raised, oral argument was only about a month away. Clemmons could have asked for appointment of new counsel to make the argument and file a supplemental brief, but he had no way of knowing whether such a motion would be granted. (Nor do we.) If he thought about his alternative, he could reasonably have concluded that it would not be in his best interest to risk having no lawyer at all to argue his case. We do not normally order the release of inmates from jail to argue their appeals pro se, and we assume the practice of the Supreme Court of Missouri is similar.

Court in <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995)). Clemmons does not have to show that he would more likely than not have been acquitted if the withheld evidence had been before the jury. "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . .." <u>Kyles</u>, 514 U.S. at 434. The question is whether the defendant, in the absence of the evidence in question, "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Ibid.</u> Further, Clemmons does not have to show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." <u>Id.</u> at 434-35

As we say above, Clemmons introduced the Gross memorandum at the Rule 29.15 hearing, but did not call Clark as a witness. Clark did testify before the District Court, and the District Court was favorably impressed by his testimony. The Court stated that "Clark may have a rather quirky personality, but he does largely 'make sense.' His credibility was rather high . . .. He seems individualistic and candid, not subject to 'prison etiquette.'" Memorandum and Order 13. The District Court concluded that "[i]t is difficult to avoid the conclusion that Clark would have been petitioner's best possible witness, during the guilt phase of the trial." <u>Id.</u> at 13-14.

In attempting to determine whether the withholding of Clark's testimony undermines our confidence in the outcome of the trial, we may at least assume that Clark would have testified at trial and that he would have said what was in the Gross memorandum. "Statements of uncalled witnesses are normally admissible at a Rule 29.15 hearing to demonstrate what the witness would have said if called at the original trial." <u>State v. Debler</u>, 856 S.W.2d 641, 653 (Mo. 1993) (en banc).

The State argues that <u>Bolder v. Armontrout</u>, 921 F.2d 1359, 1363 (8th Cir. 1990), <u>cert. denied</u>, 502 U.S. 850 (1991), stands for the proposition that "the failure to present a witness during a post-conviction evidentiary hearing constitutes a

procedural default," see Appellee's Supp. Br. 23, but this excerpt is misleading. In Bolder, petitioner argued in his state postconviction proceeding that his trial counsel was ineffective for failing "to interview or call character witnesses and inmate witnesses" for use as mitigation evidence in petitioner's capital sentencing proceeding. 921 F.2d at 1362. This Court held that this claim was procedurally barred, not because of his failure actually to call the mitigation witnesses at his 27.26 proceeding, but because petitioner completely "failed to allege what mitigating evidence would have been discovered had [his lawyer at trial] conducted a reasonable investigation into his background." Id. at 1363 n.6. The problem was not just that Bolder had failed to call the witnesses; he also neglected to allege what they would have said and thus failed to provide the 29.15 court with the particulars of his ineffective assistance of counsel claim. In contrast, Clemmons introduced Clark's statement, which, as we have already said, is admissible in 29.15 proceedings to show what Clark's testimony would have been at trial. Missouri law did not obligate Clemmons to do any more than he did to provide the 29.15 court with the factual basis for his claim. Clemmons was, therefore, not barred from presenting the substance of Clark's testimony to the District Court.

We have read the entire transcript of the guilt phase of the trial as it actually occurred in 1987. What would the evidence have looked like if the defense had been given and had used the Gross memorandum, and Clark had testified at trial as to the contents of the memorandum? First, a live witness would have testified that Fred Bagby and another inmate (who it is clear was not Clemmons) had stabbed Henry Johnson. Three other witnesses testified to the same effect at trial, but the prosecution was able to impeach their claims by pointing out that Bagby was "conveniently dead" at the time that they accused him of the murder. Bagby was alive at the time that Clark accused him of Johnson's murder. Indeed, Clark identified Bagby as the murderer less than one hour after the killing.

It is true that there were other problems with the testimony of the three witnesses who also accused Bagby of the murder. On direct examination, Justice Mays testified

unequivocally that the victim, Johnson, hit Bagby in the face, and that Bagby then pulled a knife and stabbed Johnson three times. Johnson then ran and bumped into Clemmons, the defendant. On cross-examination, however, Mays's testimony was severely undermined. When he realized that he had placed the location of the alleged collision between Johnson and Clemmons at a place nowhere near the trail of blood found on the ground, he changed his testimony about the location. This change was highlighted during the State's closing argument to the jury.

Seymour Abdullah also identified Bagby as the perpetrator, and it was during cross-examination of this witness that the State referred to Bagby as "conveniently dead." Tr. 448. According to Abdullah's version of the facts, however, it was Bagby, not Johnson, who had a collision with Clemmons, and Abdullah admitted that he saw no blood at the location of this collision. (The importance of the collision, according to the theory of the defense, is that it provides an explanation for the blood on Clemmons's sweatshirt.)

The final witness was Keith Brown, the inmate who, according to Officer Steigerwald, ran away from the scene with Clemmons and ended up with Clemmons's hat and book in his cell. Brown testified that there was a scuffle, and that Johnson began running, with Bagby right behind chasing him. Brown was less certain about the collision. He thought that Johnson appeared to have bumped into Clemmons, or another inmate named Lewis, or someone else. He then left the scene but returned to pick up some papers of his own. It was then, he said, that he happened to see a hat and some papers lying on the ground, which he picked up and took to his cell. On cross-examination, he gave confused and evasive answers about his activities in the vicinity of the chapel. His version of the facts did not appear to be consistent with the location of the chapel door.

In addition to pointing out these inconsistencies, however, the State also pointed out several times in the trial that Bagby was dead when Clemmons's witnesses accused

-11-

him of the crime. In his closing argument, counsel for the State again referred to the "conveniently deceased Mr. Bagby," Tr. 500, although he also added that both Mays and Abdullah appeared to be uncertain as to whether Bagby or the victim collided with Clemmons. Towards the end of the argument, another reference was made to the fact that the defense witnesses were blaming a dead man for the crime. At the very least, Clark would have been a witness whose identification of Bagby as Johnson's killer clearly did not stem from the fact that Bagby was no longer around to defend himself.

The State's strongest argument is that Captain Steigerwald's extremely damaging eyewitness testimony would have been unchanged by Clark's testimony. Steigerwald's testimony was clear, consistent with the physical evidence about the location of blood, and unshaken on cross-examination. It was almost dark when the incident began, and Steigerwald was a considerable distance away, but he was within 10 or 12 feet of Clemmons (the inmate in the gray sweatshirt whom he had seen strike Johnson). There is absolutely no reason to suspect that Officer Steigerwald fabricated any part of his testimony, and no one suggests that he did so. Nonetheless, Steigerwald admitted it was possible that inmates had a better view of the incident than he did. Tr. 275. In addition, though he testified originally that he had seen a knife in Clemmons's hand, he later admitted that he had only seen a flash of metal sharpened to a point. Id. at 258-59, 263. He did not see a knife handle and did not see anything in Clemmons's hand at the time Clemmons was supposed to have been assaulting Johnson. Id. at 258-59, 275. When Steigerwald caught up with Clemmons, Clemmons had eye glasses in his hand. Id. at 261, 283. We also note that Clark's story that two men stabbed Johnson is more consistent with Johnson's dying declaration that "they have stabbed me in my heart" than the State's version that Clemmons was the killer.

The other major witness for the State was Captain A. M. Gross, who testified about the admission Clemmons is supposed to have made the next morning. Clemmons denies making any such statement, but not much in the way of a concrete reason for disbelieving Captain Gross is suggested. Presumably the Clark memorandum would

have been used by the defense during cross-examination of this witness, and then Gross would have had the opportunity to explain why Clark did not make sense. Clark would have testified in the defense's case, and the jury would then have had the opportunity to assess Clark's credibility against Captain Gross's deposition testimony.

There is no question that the State's case would have remained strong even with the new evidence, and that the jury could still have reasonably determined that Clemmons was guilty. Nonetheless, we think there is a reasonable probability that the verdict would have been different were it not for this unquestioned violation of Clemmons's constitutional rights. As we described above, the State made reference several times during the trial to the fact that Bagby was dead to detract from the credibility of three of Clemmons's witnesses who accused him of the crime. The State could not have used this argument to attack Clark's testimony, and the argument would have been less helpful in attacking the testimony of the other three witnesses. The existence of the memorandum thus eliminated one of the State's key arguments for disbelieving the story that Bagby killed Johnson. We cannot say with confidence that the jury would have reached the same verdict when presented with an eyewitness who accused a different inmate of the crime within an hour of the murder, the very same inmate that three other witnesses had also accused of the crime.

To this point, we have not discussed the District Court's favorable assessment of Clark and his testimony. The Court's evaluation further dampens our confidence in the verdict. The District Court concluded that "absent procedural default or waiver by petitioner, the belated discovery of the memorandum would justify a new trial." Memorandum and Order 13. It concluded, however, that Clemmons's failure to call Clark at the 29.15 hearing barred the Court's consideration of Clark's testimony at the hearing and, in turn, the Clark memorandum. As we explain above, the District Court could at least have assumed that Clark would have testified at trial consistently with the contents of the memorandum which Clemmons presented to the 29.15 court. The only question is whether the District Court had the discretion to evaluate the witness's

-13-

credibility in addition to the substance of his testimony, despite the fact that Clemmons did not call Clark at the 29.15 hearing. We conclude that the District Court had the discretion to hold a hearing to evaluate how much of a difference Clark's testimony would have made, though it was not required to do so.

In Townsend v. Sain, 372 U.S. 293 (1963), overruled in part, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992), the Supreme Court listed six circumstances under which district courts are required to hold evidentiary hearings to develop the factual basis for a petitioner's habeas claims. 372 U.S. at 313-18. Keeney eliminates the hearing requirement for the fifth circumstance, where the facts were not adequately developed in the state courts, except where petitioners show cause and prejudice for their failure to develop the factual predicate for their claim fully in the state courts. 504 U.S. at 11-12. There is no question that Clemmons cannot show cause and prejudice and thus was not entitled to an evidentiary hearing under the fifth circumstance of Keeney.

Keeney, however, addresses only the circumstances under which an evidentiary hearing is required. "But Townsend also made clear that a District Court retained the power to hold a hearing even though one was not required . . .. This aspect of Townsend remains the law. As Justice O'Connor observed in dissent, 'the district courts . . . still possess the discretion, which has not been removed by today's opinion [Keeney], to hold hearings even where they are not mandatory.'" Pagan v. Keane, 984 F.2d 61, 64 (2d Cir. 1993) (quoting Keeney, 504 U.S. at 23 (O'Connor, J., dissenting)) (second ellipsis in original); see also Jamison v. Lockhart, 975 F.2d 1377, 1381 (8th Cir. 1992); Wilkins v. Bowersox, 933 F. Supp. 1496, 1504 (W.D. Mo. 1996), appeal submitted, No. 96-2441 (8th Cir., Mar. 10, 1997).[5] Once Clemmons properly

_____

[5]As we say above, this is not a case where the petitioner completely failed to present the factual basis for his claim to the District Court. See Bolder, supra. Unlike Bolder, Clemmons presented to the state court what was necessary under state law for the state court to consider the substance of his claim.

preserved Clark's testimony for consideration by the District Court, the District Court had the discretion to evaluate it for itself. Therefore, the District Court erroneously determined that it lacked the discretion to consider what was revealed to it at Clemmons's evidentiary hearing. The District Court's conclusion that Clark would have been a credible witness provides further support for our resolution of this issue. For these reasons, we hold that Clemmons has a meritorious Brady claim.

## III.

We now turn to Clemmons's Confrontation Clause claim. Captain Gross testified by deposition that Clemmons stated "I guess they got me" in Gross's presence shortly after Johnson's murder. Gross did not testify at trial, but his deposition was admitted into evidence with the consent of Clemmons's lawyer as a courtesy to Captain Gross, whose wife had passed away just prior to trial. Clemmons's lawyer was present at the deposition and cross-examined Gross, but Clemmons was not present because his lawyer had not informed him that the deposition was going to take place. Clemmons did not find out about the deposition until it was being introduced into evidence at his trial, and never consented to its admission. Clemmons contends on appeal that the admission of the deposition without his consent violated his right to confront the witnesses against him.

## A.

As an initial matter, the State contends that Clemmons presented only an ineffective assistance of counsel claim to the District Court, and should not be allowed to raise a free-standing Confrontation Clause claim for the first time on appeal.

It may be true that Clemmons's initial habeas petition does not artfully raise a free-standing Confrontation Clause claim. The part of the petition addressing the Gross

-15-

deposition reads "A. Mr. Clemmons was denied effective assistance of counsel during the pre-trial stage of his case because . . ." and continues:

> 3. Trial counsel agreed to the deposition of Captain Gross and did not object to presentation of Captain Gross' testimony at the time of trial without informing Petitioner of his actions. Said actions by trial counsel waived Petitioner's right to confront the witnesses against him in accordance with the Sixth Amendment to the U.S. Constitution and deprived Petitioner of his right to meaningful cross examination of those witnesses against him . . .. Clearly, there was no reason to agree to a deposition of a prosecution witness because there was no basis for such testimony to be helpful to Petitioner.

Clemmons's First Amended Petition for Writ of Habeas Corpus 3, 6-7. Yet, as the State recognizes, Clemmons raised a free-standing Confrontation Clause claim in a brief submitted after the District Court held an evidentiary hearing and over one year before the District Court filed its opinion dismissing Clemmons's petition. See Petitioner's Post-Hearing Br. 10. The State then submitted a response to Clemmons's post-hearing brief which specifically addressed the merits of Clemmons's Confrontation Clause claim. The State's response did not object that Clemmons's Confrontation Clause claim had been improperly raised in the post-hearing brief because he had failed to raise this claim in his petition.[6]

We hold that Clemmons's free-standing Confrontation Clause claim was properly presented to the District Court.

---

[6]In addition, Clemmons's pro se habeas petition expressly incorporated pleadings from the 29.15 proceeding, including the 27.26 Addendum, which expressly asserts a free-standing Confrontation Clause claim.

B.

We now turn to the State's argument that the Confrontation Clause claim is procedurally barred. The State first argues that Clemmons's failure to raise a Confrontation Clause claim on the direct appeal from his conviction bars our consideration of this claim.

Clemmons asserts ineffective assistance of appellate counsel as cause for his failure to raise the Confrontation Clause claim on direct appeal.[7] In Missouri, claims of ineffective assistance of appellate counsel are properly raised in a motion to recall the mandate. Clemmons filed an initial motion to recall the mandate which asserted a generalized claim of ineffective assistance of appellate counsel but did not specify that the failure to raise the Confrontation Clause claim demonstrated ineffectiveness. We agree with the State that this motion was not specific enough to preserve Clemmons's claim of cause. Years later, while this habeas petition was pending before the District Court, Clemmons filed a second motion to recall the mandate which was denied without comment.

---

[7]The State argues that Clemmons failed to argue ineffective assistance of appellate counsel to the District Court as cause for his failure to raise the Confrontation Clause claim on direct appeal and, therefore, is barred from doing so in this Court. We do not agree with Clemmons's contention that his assertion of cause in his Motion to Amend and Alter Judgment was sufficient to present the claim to the District Court. See Bannister v. Armontrout, 4 F.3d 1434, 1440 (8th Cir. 1993), cert. denied, 513 U.S. 960 (1994). Still, so far as we can tell, the State did not clearly assert this procedural bar in any of the papers it submitted to the District Court. Clemmons, of course, would have no reason to assert cause for a procedural bar that the State failed clearly to assert.

-17-

Apparently, Missouri law permits successive motions to recall the mandate.[8] The State does not argue that there is a regularly applied procedural rule in Missouri

---

[8]The contrary view we expressed in the initial panel opinion, see 100 F.3d at 1402, appears to have been mistaken.

that prohibits the filing of successive motions to recall the mandate. Moreover, Clemmons points to two cases in his Supplemental Brief, at 35, in which a Missouri Court of Appeals considered successive motions to recall the mandate on the merits. See Appellant's Supp. App. 12-20 (reprinting Tyler v. State, No. WD 42318 (Mo. Ct. App. 1996), and State v. Tyler, No. WD 29846 (Mo. Ct. App. 1996)). The State does not answer these citations. Instead, it invites this Court to dismiss Clemmons's claim "on equitable concerns alone" based on the time (seven years) that had passed between the rejection of his direct appeal and his second motion to recall the mandate. We decline to prevent petitioner from raising an obviously meritorious claim solely on the basis of uncertain "equitable concerns." Procedural bars must be firmly and regularly applied, and the State does not argue that such a bar exists against successive motions to recall the mandate. Nor does it assert that the passage of time has made answering the Confrontation Clause claim on the merits more difficult.

We have no trouble concluding that the failure of Clemmons's lawyer to raise the Confrontation Clause claim on direct appeal was ineffective assistance of appellate counsel, and that it thus provides cause for Clemmons's failure to raise the claim on direct appeal in state court. As we discuss below, the merits of Clemmons's claim were obvious at the time of Clemmons's direct appeal. See Banks v. Reynolds, 54 F.3d 1508, 1515 (10th Cir. 1995) (failure to raise "dead-bang winner" claim on appeal constitutes ineffective assistance of appellate counsel even though counsel may have raised other strong but ultimately unsuccessful claims). (The substantial merits of the claim provide the necessary prejudice to excuse the default.) The State argues that Clemmons's appellate counsel could not have raised this claim on direct appeal because Clemmons failed to preserve it for appeal in his motion for a new trial. But Clemmons's pro se motion for a new trial states, "The court denied defendant the right to confront his accusor [sic], when the court allowed the State to read to the jury and into evidence the deposition of Mr[.] Gross. Said conduct was unconstitutional and unnecessary in that this witness was not legally unavailable, and in fact could have been subpoened [sic] to testify." Thus, Clemmons did state in his motion for a new trial that

-19-

his Confrontation Clause rights were violated by the admission of Captain Gross's testimony.

Clemmons also presented his claim in the state 29.15 proceedings.[9] The 29.15 trial court, in its findings and conclusions, rejected Clemmons's Confrontation Clause claim on the ground that the Gross deposition was taken "with the consent of the Movant." This finding is directly contradicted by the record. Clemmons testified at the 29.15 hearing that he had not known that his lawyer had taken a deposition of Captain Gross, and that he did not find out about the deposition until trial, when the prosecutor was discussing the introduction of the transcript with the judge. 29.15 Hearing Tr. 121. There is no evidence to the contrary in the record.

The State argues that Clemmons did not properly present his Confrontation Clause claim to the Missouri Supreme Court in the 29.15 appeal. As Clemmons argues, he attempted to bring this issue to the attention of the Missouri Supreme Court, first by instructing postconviction counsel to raise it, and then by filing his own pro se brief incorporating pleadings that raised it.[10] As we have held in Part II of this opinion, these efforts by Clemmons were sufficient to present the issue to the Missouri Supreme Court. The State points to no authority suggesting that there is a state rule that is "strictly or regularly adhered to," see <u>Grubbs v. Delo</u>, 948 F.2d 1459, 1462 (8th Cir. 1991), <u>cert. denied</u>, 506 U.S. 835 (1992), that prohibits the filing of pro se briefs by parties already represented by counsel. Clemmons, on the other hand, points to authority demonstrating that "such pro se briefs have been accepted by the Missouri Supreme Court in other cases." Appellant's Supp. Br. 31 (citing <u>State v. Peterson</u>, 518 S.W.2d 1, 2 (Mo. 1974)).

---

[9]The State does not argue that the Confrontation Clause claim was not cognizable in a 29.15 proceeding. Compare 100 F.3d at 1403 n.7.

[10]In a pro se submission to the 29.15 trial court Clemmons asserted that the admission of the Gross deposition "denied Movant his right to confront [witnesses] against Movant." See Clemmons's 2d Addendum to Rule 27.26 Motion.

C.


Thus, no procedural bar prevents us from considering Clemmons's Confrontation Clause claim on the merits. The State next argues that Teague v. Lane, 489 U.S. 288 (1989), precludes our consideration of Clemmons's Confrontation Clause claim. Teague and its progeny prohibit federal courts from resolving habeas claims based on rules of constitutional law that were not "dictated by precedent" existing at the time that the habeas petitioner's state conviction became final. 489 U.S. at 301 (plurality opinion). Far from being a "new rule" of constitutional law, however, Clemmons's claim presents a paradigmatic violation of the Confrontation Clause as it has been traditionally interpreted by the Supreme Court.[11]

Since its original interpretation of the Confrontation Clause in Mattox v. United States, 156 U.S. 237 (1895), the Supreme Court has determined that

---

[11]We assume without deciding that when the Court says "firmly dictated by precedent," it means Supreme Court precedent. See Lockhart v. Fretwell, 506 U.S. 364, 376 (1993) (Thomas, J., concurring) (state courts not obligated by the Supremacy Clause to follow circuit precedent); see also Glock v. Singletary, 65 F.3d 878, 885 (11th Cir. 1995) (en banc) ("[C]ourts of appeals do not 'dictate' a particular rule to state courts" for purposes of Teague analysis.), cert. denied, 117 S. Ct. 225, 616 (1996). We thus do not consider Don v. Nix, 886 F.2d 203 (8th Cir. 1989). That case, which was decided shortly after Clemmons's conviction became final anyway, held that the defendant "clearly had a right to attend" a deposition admitted into evidence because "the right to confront an accuser means . . . the right to be physically present when the accusations that the jury will hear are made." Id. at 206. We also note that the Missouri Constitution requires that the Confrontation Clause rights of a defendant be protected for any pretrial depositions to be used in lieu of trial testimony. Mo. Const. art. I, § 18(b); see State v. Jackson, 495 S.W.2d 80, 87 (Mo. App. 1973) (Pretrial deposition taken without presence or consent of defendant "unusable by the state . . . because it was constitutionally and basically unacceptable for any purpose.") (emphasis in original).

> The primary object of the [Confrontation Clause] was to prevent depositions or <u>ex parte</u> affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

<u>Id.</u> at 242-43; see also <u>Maryland v. Craig</u>, 497 U.S. 836, 845 (1990) (quoting this passage); <u>Coy v. Iowa</u>, 487 U.S. 1012, 1017 (1988) ("'[T]he Confrontation Clause provides two types of protection for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination.'") (quoting <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 51 (1987) (plurality opinion)).

Clemmons was denied the right to face-to-face confrontation with one of his two accusers (the other being Steigerwald), the right to have the jury observe the witness's demeanor, the right to participate in the cross-examination of the witness, and the right to observe the witness against him, in short every single element of the right of confrontation. This is not a violation about which reasonable jurists may disagree, see <u>Sawyer v. Smith</u>, 497 U.S. 227, 234 (1990), nor are these mere general principles which require jumps in reasoning to conclude that Clemmons's rights were violated, <u>id.</u> at 236. Instead, they are concrete requirements circumscribed only in rare situations "where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." <u>Craig</u>, 497 U.S. at 850. So far the Court has held that only protecting victims of child abuse from face-to-face confrontation with their alleged abuser justifies departure from the norm of face-to-face confrontation. In addition, we note that even in <u>Maryland v. Craig</u>, where

-22-

the State had allowed a child to testify against her alleged abuser by closed-circuit television, the jury still had the opportunity to view the child's demeanor, the defendant had the opportunity to participate in the cross-examination of the witness, and the defendant had the opportunity to observe the witness. Nor is there any plausible argument that Captain Gross's testimony is so inherently reliable that cross-examination before the trier of fact in front of Clemmons and the jury would have been of only marginal value. See Ohio v. Roberts, 448 U.S. 56, 66 (1980) (to be admissible, hearsay must possess particularized guarantees of trustworthiness that make such a statement as reliable as a "firmly rooted" hearsay exception). Accordingly, we hold that Teague is not an obstacle to our consideration of Clemmons's claim.

As we have shown above, Clemmons consented neither to the taking of the deposition nor to its admission in evidence against him at trial. The State does not argue that the right was waived either by Clemmons himself or by his counsel, and, in any event, the law seems to be clear that the right of confrontation is personal and fundamental and cannot be waived by counsel. See, e.g., Brookhart v. Janis, 384 U.S. 1, 7 (1966). Nothing in this record remotely approaches a waiver by Clemmons of this fundamental right. "There is a presumption against the waiver of constitutional rights, see, e.g., Glasser v. United States, 315 U.S. 60, 70-71, and for a waiver to be effective it must be clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege.' Johnson v. Zerbst, 304 U.S. 458, 464." Brookhart, supra, 384 U.S. at 4.

The State does argue that the error was harmless. More precisely, it asserts that "petitioner fails to demonstrate that the error was not harmless." Appellee's Supp. Br. 20. This formulation would turn the law upside down. Confrontation is a "'fundamental requirement,'" Lee v. Illinois, 476 U.S. 530, 540 (1986) (quoting Painter v. Texas, 380 U.S. 400, 405 (1965)). Under our precedents, where, as here, the state courts have not themselves engaged in a harmless-error analysis with respect to the particular point at issue, we can hold an error harmless only if the State establishes

harmlessness beyond a reasonable doubt. In other words, in such a situation, the standard of <u>Chapman v. California</u>, 386 U.S. 18 (1967), applies. See, <u>e.g.</u>, <u>Orndorff v. Lockhart</u>, 998 F.2d 1426, 1429 (8th Cir. 1993), <u>cert. denied</u>, 511 U.S. 1060, 1063 (1994). The State has not even begun to meet this exacting standard in the instant case. We do not know whether Captain Gross's testimony would have been different nor do we know to what extent it might have been different had Mr. Clemmons been notified and allowed to be present. That is, however, exactly the point. The burden is on the State here to show harmlessness, and it cannot do so.

## IV.

The failure to disclose the Gross memorandum and the admission of Captain Gross's testimony by deposition are both violations of fundamental constitutional rights which independently justify reversal of Clemmons's conviction.[12] The judgment is reversed, and the cause remanded to the District Court with instructions to enter a new judgment granting the writ of habeas corpus, thus vacating Clemmons's conviction. The State of course is free to retry him, and he will remain in custody because of his convictions for other crimes.

A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[12]Clemmons also argues that his trial counsel was ineffective in failing to preserve for appellate review the order of the trial court excluding the testimony of one Robert E. Lee. We reject this argument without extended discussion.